Joseph Siprut [IL Bar No. 6279813]
*jsiprut@siprut.com*
Todd McLawhorn [IL Bar No. 6244265]
*tmclawhorn@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, IL  60602
(312)236-0000

Mitchel J. Olson [CA Bar No. 082566]
*molson@lawmed.net*
Law Office of Mitchel J. Olson
1901 Camino Vida Roble, Suite 121
Carlsbad CA 92008
(858)688-7975

*Attorneys for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**CATHERINE WOOLSEY, CAROL BALL,** *and* **RACHEL REIDINGER,** *both individually and on behalf of all others similarly situated,*

            *Plaintiffs,*

    *vs.*

**J.P. MORGAN VENTURES ENERGY CORPORATION** *and* **JPMORGAN CHASE & CO.,**

            *Defendants.*

Case No.:   '15CV0530 L    BGS

**CLASS ACTION**

**COMPLAINT FOR DAMAGES PURSUANT TO 18 U.S.C. §§1961 et seq. (RICO)**

**DEMAND FOR JURY TRIAL**

# **TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION ....................................................................1

II.   JURISDICTION AND VENUE ...................................................................3

III.  PARTIES ........................................................................................................3

IV.   SUBSTANTIVE ALLEGATIONS ..............................................................4

    A. JPM Ventures' tolling rights in California power plants ......................4

    B. The California Wholesale Electricity Market .......................................5

        1.  CAISO superintends the wholesale market...........................5

        2.  Minimum production is compensated in the Day-ahead
           market at a different rate than the single bid price ...............6

    C. JPM Ventures' manipulation of the California wholesale electrical
      market ........................................................................................7

        1.  September 2010 – March 2011:  the BCR manipulation
           strategy .................................................................................8

        2.  JPM Ventures fraudulently misrepresented why it didn't
           self-schedule      ...................................................................11

        3.  January 2011:  the ramp-rate market manipulation.............12

        4.  April to June 2011: The clock-strikes-twelve ramp-down
           manipulation ........................................................................13

        5.  January to March 2011:  the regulation down manipulation13

        6.  April 2011:  yet another Ancillary Services market
           manipulation strategy ..........................................................14

        7.  March – November 2012:  the let's-not-be-so-obvious
           strategies .............................................................................16

    D. JPM Ventures' manipulative schemes operated as a fraud on the

California wholesale electrical market.................................................17

E. California's retail electrical consumers have been damaged by JPM
Ventures' illegal and fraudulent conduct...........................................18

1. The costs of JPM Ventures' market manipulation were
passed on to utilities .........................................................18

2. The utilities have passed on the cost of JPM Ventures'
market manipulation to their retail customers ....................19

V.    CLASS ACTION ALLEGATIONS ...........................................................20

VI.   CLAIMS ALLEGED ..................................................................................24

VII.  JURY DEMAND ........................................................................................27

VIII. PRAYER FOR RELIEF.............................................................................27

By and through their undersigned counsel, lead plaintiffs Catherine Woolsey, Carol Ball, and Rachel Reidinger (collectively "plaintiffs") allege the following against defendants J.P. Morgan Ventures Energy Corporation (JPM Ventures), and JPMorgan Chase & Co. (JPMorgan) upon personal knowledge as to those allegations concerning plaintiffs. As to all other matters, the allegations are made based on investigations by plaintiffs' counsel, which include (a) review and analysis of the July 30, 2013; (b) settlement between JPM Ventures and the Federal Energy Regulatory Commission (FERC); (c) analysis of the operation of the California wholesale electricity market; (d) investigation of the relationship between the cost to utilities of purchasing electricity in the California wholesale electricity market and electricity rates paid by California ratepayers; and (e) the historical rates of California utilities during the years 2010 – 2012.

## I. SUMMARY OF THE ACTION

1.      This is a class action brought against the defendants for operating an enterprise and engaging in a pattern of racketeering activity in violation of 18 U.S.C. §§1961 *et seq.* (the Racketeer Influenced and Corrupt Organizations Act ("RICO")). Defendants manipulated the price of electricity in the California electricity market, to the detriment of California retail electrical consumers.

2.      JPM Ventures is a wholly owned subsidiary of JPMorgan. JPM Ventures engages in financial transactions related to commodities, including electricity. Its electrical transactions include leasing the rights to the output of a number of electrical generating plants in Southern California. Power produced by those plants is sold by JPM Ventures in the California electrical wholesale market.

3.      The wholesale market is operated by California Independent System Operator Corporation (CAISO), a nonprofit public benefit corporation that controls and manages 80% of the California electrical transmission grid. CAISO is regulated by FERC.

4.     Electricity is bought and sold in the wholesale market through an automated market system operated by CAISO. By illegally exploiting CAISO's bidding rules and the limitations of its automated system, JPM Ventures turned inefficient power plants that ordinarily lost money into highly profitable assets.

5.     More specifically, JPM Ventures knowingly and willfully violated 16 U.S.C. §824v(a), which prohibits using manipulative or deceptive devices or contrivances in connection with the purchase or sale of electric energy. When queried about its bidding practices by CAISO's market monitor unit, JPM Ventures made fraudulent misrepresentations about the reasons for its bidding practices and submitted misleading profit and loss statements in violation of 16 U.S.C. §824u. Such violations are punishable pursuant to 16 U.S.C. §825o by fines and imprisonment.

6.     In settlement of a formal investigation undertaken by FERC, JPM Ventures admitted the facts constituting the violations in writing. On July 30, 2013, FERC issued an order approving the settlement with JPM Energy.

7.     FERC's enforcement powers against violators of the Federal Power Act (FPA) are limited to seeking remediation on behalf of injured third parties. As a result, FERC's recovery on behalf of California retail electricity consumers was limited to unjust profits illegally gotten by JPM Ventures in the amount of $124 million (JPM Ventures also paid fines to the U.S. Treasury). FERC is not statutorily or otherwise empowered to enforce violations of the FPA by requiring violators to pay actual damages to parties injured by their violations. In exercising the enforcement powers that it has, FERC rejected and disapproved the wholesale electricity rates resulting from JPM Ventures' market manipulation and recognized that the rates were incorrect.

8.     Among other things, FERC determined that (a) between September 2010 and November 2012 JPM Ventures designed its bidding strategies to obtain above-market prices for its sale of electricity, and that its designs were usually successful

in garnering premium rates for the electricity it generated and sold; (b) JPM Ventures employed fraudulent schemes, artifices, devices, and contrivances, and made false statements or material omissions, or engaged in a course of business that operated or would operate as a fraud on participants in the California wholesale electricity market and on CAISO; and (c) JPM Ventures' bids were not based on competitive market principles but on a manipulation of the market. JPM Ventures' purpose in submitting its bids was not to make money based on market fundamentals, but to create artificial conditions that would cause the CAISO system to pay JPM Ventures at above market rates based on illegal market manipulations.

9.     The actual damages to California electrical ratepayers from the cost of paying for defendants' illegal market manipulation was substantially in excess of the unjust profits FERC recouped on behalf of California electrical consumers.

## II.   JURISDICTION AND VENUE

10.    This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 18 U.S.C. §§1964(a) and (c) and 28 U.S.C. § 1331. Additionally, the Court has specific jurisdiction over the defendants because JPM Ventures' illegal and fraudulent scheme was directed at manipulating the generation and prices of electricity in California.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## III.   PARTIES

*Plaintiffs*

12.    During the period from January 1, 2010, through December 31, 2012, plaintiff Katherine Woolsey was a resident of California and was a residential consumer of electricity. She was billed for her electrical consumption by San Diego Gas & Electric Company (SDGE) on a monthly basis, and she monthly paid SDGE for the amounts billed.

3

13.    During the period from January 1, 2010, through December 31, 2012, plaintiff Carol Ball was a resident of California and was a residential consumer of electricity. She was billed for her electrical consumption by SDGE on a monthly basis, and she monthly paid SDGE for the amounts billed.

14.    During the period from January 1, 2010, through December 31, 2012, plaintiff Rachel Reidinger was a resident of California and was a residential consumer of electricity. She was billed for her electrical consumption by Southern California Edison (SCE) on a monthly basis, and she monthly paid SCE for the amounts billed.

*Defendants*

15.    Defendant JPM Ventures is a Delaware Corporation that is a wholly owned subsidiary of JPMorgan Chase & Co. JPM Ventures' principal place of business is New York City, New York. The company is engaged in financial transactions relating to commodities, including the generation and sale of electricity.

16.    Defendant JPMorgan is a Delaware Corporation with its principal place of business in New York City, New York. The company touts itself as a "leading global financial services firm with assets of $2.4 trillion," operating in "more than 60 countries," and having 260,000 employees.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  JPM Ventures' tolling rights in California power plants

17.    Following the collapse of Bear Stearns in 2008, JPM Ventures acquired Bear Stearns' assets in a fire sale. The assets included rights in long-term tolling (lease) agreements to gas-fired power plants in Southern California. Pursuant to the tolling agreements, JPM Ventures paid the owner of the plants, AES, $170 million/year and acquired the right to sell the plants' electrical output.

18.    Prior to JPM Ventures' acquisition of the rights in the tolling agreements, Bear had re-tolled (subleased) to SCE its tolling rights to four AES plants until January 1, 2011; another six plants were re-tolled until January 1, 2012; and other

4

plants were re-tolled to later dates.

19.    The AES plants were built in the 1950's and 1960's and utilize single-cycle steam technology. The steam is created by burning natural gas to heat water. That technology is much less efficient in converting the energy in natural gas to electricity than are plants built more recently using combined cycle technology.

20.    The inefficiency of the AES plants places them at a significant competitive disadvantage in the California wholesale electrical market.

21.    In preparation for assuming control of four plants on January 1, 2011, JPM Ventures acquired rights to two other Southern California plants (Huntington Beach 3&4 (HB3&4)) in January 2010. One motivation for that acquisition was to develop experience with the California wholesale electrical market prior to assuming control of the other AES plants.

**B.   The California Wholesale Electricity Market**

**1.   CAISO superintends the wholesale market**

22.    FERC has promoted the formation of Independent System Operators (ISO's) to control and manage electric transmission grids in various regions throughout the United States. ISO responsibilities include the operation of wholesale markets in which electricity is bought and sold.

23.    CAISO is the California ISO. It operates under a complex set of rules and definitions denominated the "Tariff." The Tariff is approved by FERC, which regulates CAISO.

24.    As a non-profit public benefit corporation regulated by FERC, CAISO's purpose is to operate an open access electric transmission grid that provides a reliable supply of electricity to California consumers at a competitive cost.

25.    Electricity is a highly unusual commodity because it cannot be stored. One of CAISO's responsibilities is precisely matching electrical output with demand (it claims to monitor output and demand every 5 minutes). In managing the wholesale market, CAISO has the task of ensuring the reliable production of electricity at a

competitive cost to buyers.

26.     CAISO operates "Day-ahead" and "Real-time" wholesale electricity markets. The Day-ahead market opens seven days before the "trade date" (the day on which electricity will be generated and consumed) and closes at 10:00 a.m. on the day before the trade date. CAISO attempts to anticipate and provide for the demand for electricity on any given trade date through the Day-ahead market.

27.     The Real-time market opens at 1:00 p.m. the day before the trade date and closes 75 minutes before any particular "trading hour." CAISO uses the Real-time market to respond to changes in actual demand from the demand anticipated by the Day-ahead market.

28.     The units of exchange in both markets are mega-watt-hours (MWh); i.e., one million watts of electricity per hour.

29.     Sellers and buyers submit bids via an automated system using CAISO software.

30.     The acceptance of a seller's bid is sometimes referred to as an "award."

31.     In the Day-ahead market, the bid process results in a "single bid price" (in dollars/MWh) for a particular trade date; i.e., the price at which the available supply of electricity at that price and the demand for electricity at that price are in equilibrium.

32.     Regardless of a buyer or seller's actual price bid per megawatt/hour, all buyers awarded a bid pay the single bid price, and all sellers awarded a bid are paid the same single bid price, subject to other Tariff rules described below.

33.     CAISO posts the single bid price at 1:00 p.m. the day before the trading date.

34.     A typical Day-ahead price in 2010 – 2012 was in the $30 – $35/MWh range.

35.     In the Real-time market the bid process results in a single bid price for a particular trade hour.

**2. Minimum production is compensated in the Day-ahead market at a different rate than the single bid price**

36.     Steam generators can operate at different capacities; i.e., a given generator can produce varying amounts of electricity, depending on the capacity at which it operates. The lowest amount of electricity that a given plant can reliably generate is called its "Pmin," the maximum its "Pmax."

37.     Every month sellers submit a "Minimum Load Cost" (MLC) to CAISO for their generators. The MLC is the price that the seller demands to produce a generator's Pmin.

38.     The MLC cannot exceed twice a generator's estimated operational costs for the up-coming month.

39.     When CAISO accepts a seller's bid, the minimum amount of electricity that the seller will produce is its Pmin.

40.     Regardless of whether a generator is producing Pmin or more than Pmin, the seller will be compensated in the Day-ahead market for producing Pmin at its MLC and not at the single bid price. A seller's MLC is usually higher than the average single bid price.

41.     The amount of electricity that the seller generates above its Pmin will be compensated in the Day-ahead market at the single bid price, subject to some exceptions as set forth below.

**C. JPM Ventures' manipulation of the California wholesale electrical market**

42.     During the first eight months of 2010, JPM Ventures tried various bidding strategies to sell electricity produced by HB3&4, but the units infrequently received CAISO awards because of their inefficiency and high operating costs. With little revenue and large tolling payments during that time, JPM Ventures incurred substantial losses.

43.   JMPVEC thereafter resorted to illegal market manipulation to turn the inefficient, money losing generators into cash cows.

> **1. September 2010 – March 2011: the BCR market manipulation strategy**

44.   No later than September 8, 2010, JPM Ventures began manipulating the CAISO wholesale market in violation of federal law.

45.   JPM Ventures' first illegal market manipulation scheme was designed so that 1) it would be paid for producing electricity at its MLC and not the single bid price; and 2) it would receive Bid Cost Recovery (BCR) payments.

> **a.   Securing the bid**

46.   Step one of the scheme was to submit maximum MLC's to CAISO; i.e., the price per megawatt hour was double JPM Ventures' operating costs. Because of the inefficiency of the JPM Ventures generators, operating costs were approximately $45/MWh, or about 50% higher than the average Day-ahead single bid price of approximately $30/MWh. JPM Ventures' MLC's were hence approximately $90/MWh (twice its operating costs).

47.   Second, JPM Ventures submitted the lowest Day-ahead price bid the Tariff permitted of -$30/MWh (a "negative" bid).

48.   By bidding the minimum price the Tariff allowed, JPM Ventures maximized the odds that its bids would be accepted.

> **b. Buying back production above Pmin**

49.   A third element of JPM Ventures' manipulative scheme was bidding to produce electricity in an amount in excess of Pmin while actually producing only at Pmin. JPM Ventures thus placed bids in the Day-ahead market to produce electricity in excess of a generator's Pmin.

<u>By bidding to **buy** electricity in the Real-time market,
a seller can reduce its electrical production</u>

50.    A seller that has won a Day-ahead award can bid in the Real-time market to "buy back" all or some portion of its Day-ahead award. If the seller's Real-time bid is accepted, it will not produce all of the electricity it was originally obligated to generate to fulfill its Day-ahead bid.

51.    Step four of JPM Ventures' market manipulation was to make Real-time bids to buy back that portion of a Day-ahead award above Pmin. When that strategy was successful, as it often was, JPM Ventures produced at Pmin.

52.    With a generator operating at Pmin, JPM Ventures was compensated at the generator's MLC – twice its noncompetitively high operating costs – and not the single bid price, which was typically much lower than the MLC.

**c. JPM Ventures gamed the Tariff to get BCR**

53.    One of JPM Ventures' principal purposes in submitting Day-ahead awards in excess of Pmin and then buying back that portion of the award above Pmin was to illegally manipulate the market to receive Bid Cost Recovery (BCR).

<u>CAISO sometimes orders sellers not to produce
all of the electricity the seller had successfully
bid to supply</u>

54.    In balancing supply and demand for electricity in the California electrical grid, CAISO sometimes instructs a generator to reduce its output from the production amount that the generator was awarded in a Day-ahead bid. This is referred to as a "decremental" instruction, and the generator is said to have been "dec'ed down."

55.    Decremental instructions are limited to that quantity of electricity being generated above a plant's Pmin. In other words, CAISO instructs a generator to produce only the amount of electricity it can reliably generate, i.e., its Pmin.

56.    BCR is intended to fairly compensate honest, law abiding market competitors when CAISO issues dec down orders. The seller is paid for the electricity that it was going to produce to fulfill a Day-ahead award but that isn't produced because of a dec down order.

57.    By winning Day-ahead awards for production amounts in excess of Pmin (by offering to supply electricity at a negative rate) and then buying back production above Pmin (the minimum amount the plant could reliably produce), JPM Energy manipulated the market to contrive circumstances similar to dec down orders. JPM Ventures was hence paid 1) MLC for producing at Pmin, *and* 2) BCR for the amount of electricity it had bid to produce in excess of Pmin but subsequently bought back in the Real-time market.

### d.  JPM Ventures finessed its Real-time bids to finagle BCR payments

58.    In bidding to buy back production in the Real-time market, JPM Ventures' Real-time bids were generally around 120% of the Day-ahead market price. Under the complicated Tariff rules, higher bids would have reduced JPM Ventures' BCR. JPM Ventures thus bid amounts just high enough to win its purchase bids in the Real-time market but just low enough to avoid any significant impact on BCR.

### e. JPM Ventures' BCR strategy was highly lucrative

59.    Between September 8, 2010, and March 10, 2011, JPM Ventures collected market revenues of $21.9 million and BCR of $34.6 million for HB3&4, while spending $29.5 million on operating costs.

60.    In October 2010 JPM Ventures created spreadsheets for its California power plant assets. "Blue sky" estimates were that if JPM Ventures continued to make similar bids and receive similar awards for another eight years, the AES 4000 and HB3&4 units would generate net profits, after tolling payments and gas and other operating costs, of between $1.5 and $2.0 billion. On the other hand, if the units received no revenues of any kind, JPM Ventures would still be liable for more

than $1.5 billion in tolling payments and other fixed costs.

61.   In January 2011 a team of JPM Ventures employees created a PowerPoint presentation stating that JPM Ventures had "successfully executed a new asset optimization strategy for HB3&4" that "capture[d] the Bid Cost Recovery energy revenue." According to the presentation, JPM Ventures had received $24 million in BCR revenues for the HB3&4 plants and $14 million in market revenues. Operating costs were $17.7 million.

### f. JPM Ventures fraudulently misrepresented its strategies to CAISO

62.   Eventually alerted to JPM Ventures' unusual bidding activity, CAISO's market monitoring unit placed telephone calls in March and April 2011 to the JPM Ventures personnel responsible for placing bids in the California wholesale electrical market.

63.   In the time period between March and May 2011, legal counsel and senior representatives from three departments within JPM Ventures, including the compliance department, discussed JPM's response to CAISO's inquiries and requests.

### 2.  JPM Ventures fraudulently misrepresented why it didn't self-schedule

64.   One common bidding practice by sellers is referred to as a "self-schedule" – a bid to supply a specified quantity of electricity with no specification of price. Such a seller is a "price taker;" i.e., the seller agrees to supply the electricity for the market (single bid) price.

65.   In its telephone calls with JPM Ventures, CAISO asked why JPM Ventures was submitting negative bids in the Day-ahead market rather than self-schedules. JPM Ventures responded that it couldn't predict revenues from self-scheduling. JPM Ventures fraudulently concealed from CAISO that it didn't self-schedule because to do so would make JPM Ventures ineligible for BCR under the CAISO

Tariff and that JPM Ventures' bidding strategy was predicated on maximizing BCR payments.

JPM Ventures submitted misleading<br>profit and loss statements to CAISO

66.    In March and May 2011, the CAISO market monitor unit asked JPM Ventures for spreadsheets or other tools it used to calculate the profitability of the HB3&4 generators and one other AES plant that JPM Ventures controlled. On June 13, 2011, JPM Ventures provided CAISO with profit and loss statements that were *not* used by the JPM Ventures division responsible for making CAISO bids. JPM Ventures thereby deceived CAISO as to the financial figures behind its bidding strategies.

67.    In reasonably relying on the misrepresentations by JPM Ventures and the misleading profit and loss statements that JPM Ventures submitted to CAISO, CAISO allowed JPM Ventures to continue to sell electricity in the California wholesale market without restrictions on JPM Ventures' bidding practices.

### 3.  January 2011: the ramp-rate market manipulation

68.    When JPM Ventures assumed control of four of the AES generators on January 1, 2011, it implemented a new manipulative strategy for two of the plants (AL3&4). It submitted a Day-ahead self-schedule (price taker) bid for every third hour of the day. For the intervening two hours, it submitted Day-ahead price bids at a rate between $73/MWh and $98/MWh.

69.    CAISO's automated bidding system gives preference to self-schedule bids. As a result, JPM Ventures' self-schedule bids were generally accepted. On the other hand, the high price bids for the intervening two hours were generally not accepted because they weren't competitive.

70.    Because generating electricity with natural gas is not like throwing a switch, it may take hours of operation for a generator to reach a particular production level ("ramping up") and hours more to "ramp down" after fulfilling an award.

71.   Because a seller is deprived of the opportunity to sell electricity at the market rate during ramp times, CAISO compensates a generator for its ramp time at the rate the seller has previously bid to supply electricity during those times.

72.   This Tariff provision is intended to fairly compensate honest, law abiding market competitors for their ramp time and not market manipulators like JPM Ventures whose principal intent is to receive noncompetitive rates for ramp time rather than competitive rates for production time.

73.   JPM Ventures' manipulative strategy illegally exploited the Tariff. As a result, JPM Ventures was paid its noncompetitive bid price ($73/MWh - $98/MWh) for the electricity generated during the two hours preceding and following every hour it had received a self scheduled bid. The strategy thus earned JPM Ventures well in excess of the market rate for two out of every three hours of generator operation.

### 4.   April to June 2011: The clock-strikes-twelve ramp-down manipulation

74.   In April 2011 JPM Ventures began submitting negative Day-ahead bids of -$30/MWh for the hours at the end of a particular day (day one). It also submitted near maximum Day-ahead bids of $999/MWh (the Tariff maximum is $1,000/hour) for the hours between 12:00 a.m. and 2 a.m. of day two.

75.   JPM Ventures' manipulative strategy took advantage of the limitations of CAISO's automated bidding system, which only evaluates bids during a single calendar day. The minimum negative bids for day one resulted in bid acceptance because the system did not take into account the market consequences of accepting those bids for day two.

76.   CAISO was thus obligated to pay JPM Ventures $999/MWh for electricity produced while ramping down after midnight. While this was a staggering rate by itself, the manipulation was all the more egregious because the market price of

electricity between midnight and 2 a.m., when the demand is low, was typically around $12/MWh.

### 5.  January to March 2011: the regulation down manipulation

77.    Because of the size and complexity of the California electric transmission grid and the challenge of balancing fluctuating demand and supply, there are a variety of "Ancillary Services" that CAISO utilizes. Sellers can bid to supply such services.

78.    Two types of Ancillary Services are "Regulation Up" and "Regulation Down." If a bid for one of these services is accepted, CAISO externally controls output of a generator through an automated system, thereby enhancing CAISO's ability to fine-tune output in response to real time system-wide demand. A Regulation Up award entitles CAISO to increase the output of a generator from a particular baseline output while a Regulation Down award entitles CAISO to do the reverse.

79.    Because of the challenges of balancing supply and demand, CAISO's automated system gives preference to Regulation Up and Down bids. As with regular price bids in the Day-ahead market, CAISO's software also gives preference to Regulation Up and Down self-schedule (price taker) bids.

80.    If a seller submits both a regular price bid *and* a Regulation Up or Down self-schedule bid for the same hours, an award of the Ancillary Service bid entitles the seller to payment at the price bid rate to compensate the seller for being deprived of the opportunity to compete in the marketplace to sell its output for the market price. This Tariff provision is intended to fairly compensate honest, law abiding market competitors who provide important Ancillary Services and not market manipulators like JPM Ventures.

81.    In January 2011 JPM Ventures implemented yet another manipulative scheme in bidding the output of AL3&4. It submitted two bids in the Day-ahead market for the same hours. One was a Regulation Down self-schedule bid and one

was a price bid for a specified output at a rate between $60/MWh and $88/MWh.

82.    The Regulation down bids were generally accepted while the non-competitive price bids were not. Nevertheless, pursuant to the Tariff JPM Ventures was paid at the noncompetitive price bid rate for the electricity generated during Regulation Down hours despite the fact that JPM Ventures had originally submitted a self-schedule bid.

### 6.  April 2011: yet another Ancillary Service market manipulation strategy

83.    In April 2011 JPM Ventures submitted Day-ahead bids of $1/MWh to supply certain types of Ancillary Services (not Regulation Up or Down) for particular hours. The low bid price was calculated to obtain a bid award.

84.    The Ancillary Services JPM Ventures bid to supply typically require operating generators at well above Pmin.

85.    For the same hours for which it had been awarded Day-ahead Ancillary Service bids, JPM Ventures submitted near maximum Real-time bids of $999/MWh.

86.    This manipulative strategy exploited a feature of the CAISO automated system that instructs generators running above Pmin to dec down to Pmin whenever Real-time bids near the maximum are submitted.

87.    However, a generator operating at Pmin cannot supply the particular Ancillary Services required by CAISO. CAISO was hence forced to issue what are referred to as "exceptional dispatches;" i.e., manual instructions overriding the automated system.

88.    The exceptional dispatches directed JPM Ventures generators to run at the levels above Pmin required to provide the Ancillary Services already awarded.

89.    If a seller makes a Real-time bid for hours affected by an exceptional dispatch, the Tariff provides that the output required by the dispatch is paid at the Real-time bid rate.

90.    This Tariff provision is intended to compensate honest, law abiding market competitors when CAISO issues exceptional dispatches that affect a seller's production and not market manipulators like JPM Ventures who contrive circumstances that require dispatches.

91.    This manipulative strategy fetched JPM Ventures a near maximum rate of $999/MWh for output above Pmin after originally bidding to provide those services for $1/MWh.

**7.  March – November 2012: the let's-not-be-so-obvious strategies**

92.    In response to an investigation begun by FERC in 2011, JPM Ventures sought to make its market manipulation less obvious. During the period from March through November of 2012, it employed several schemes to this end.

**a.    Variations on the clock-strikes-twelve theme**

93.    Some of the units that JPM Ventures operated have 24 hour "minimum run times," i.e., "The minimum amount of time that a Generating Unit must stay on-line after being started-up prior to being Shut-Down, due to physical operating constraints."

94.    For its units with 24 hour minimum run times, JPM Ventures submitted negative Day-ahead bids of -$30/MWh for the hours between 9:00 p.m. and midnight on day one.

95.    The minimum day one price bids were designed to secure bid acceptance.

96.    As has been previously alleged, a generator is compensated for its Pmin at MLC. As has also been previously alleged, JPM Ventures' MLC's were very high because 1) the inefficiency of its generators resulted in noncompetitively high operating costs, and 2) JPM Ventures used the maximum multiplier of its operating costs that the Tariff allowed (two) in submitting MLC's to CAISO. Consequently, CAISO's automated system rarely accepted Pmin bids from JPM Ventures because they were substantially in excess of market prices.

16

97.    To gain bid acceptance, JPM Ventures made day one bids for production well in excess of Pmin.

98.    JPM Ventures also submitted bids calculated to be above market price for day two.

99.    The non-competitive day two price bids were designed to ensure that the generators did not have to produce above Pmin for 21 of the 24 hours of the minimum run time.

100.   In illegally manipulating the market in this manner, JPM Ventures was able to garner payment at a generator's MLC – double its operating costs – for all of the electricity produced during 21 out of the 24 hours that the generator operated.

### b. The exceptional dispatch manipulations

101.   Pursuant to Tariff rules, output from generators subject to an exceptional dispatch is compensated at the Real-time bid rate. This Tariff provision is intended to fairly compensate honest, law abiding market competitors when exceptional dispatches interfere with their competitive activities and not market manipulators like JPM Ventures who engineered their activities to take financial advantage of exceptional dispatches.

102.   When it received notices that CAISO intended to issue an exceptional dispatch regarding one of its generators, JPM Ventures submitted Real-time maximum bids of $1,000/MWh.

103.   When JPM Ventures anticipated market conditions on particular days that were likely to prompt exceptional dispatches, it submitted Day-ahead bids of $250/MWh or higher to ensure that it did not receive awards for those days.

104.   By having available capacity on days when CAISO was more likely to issue exceptional dispatches, JPM Ventures maximized its chances of receiving an exceptional dispatch.

105.   JPM Ventures also submitted Real-time bids of $1,000/MWh for the hours it calculated were most likely to result in an exceptional dispatch, entitling it to be

compensated at the Real-time bid price if one of its generators was dispatched.

106.   JPM Ventures was frequently able to successfully anticipate hours when exceptional dispatches were issued. For those hours it was paid the maximum rate of $1,000/MWh.

**D. JPM Ventures' manipulative schemes operated as a fraud on the California wholesale market**

107.   CAISO and the buyers and sellers in the California wholesale electrical market relied on the integrity of the market participants, including JPM Ventures, in the operation of the market from September 2010 to November 2012. More particularly, market participants relied on each other, including JPM Ventures, to participate in the market, and to place bids, based on competitive market principles and forces and not for the purpose of illegally manipulating the market for financial gain.

108.   Furthermore, market participants relied on each other, including JPM Ventures, to abide by the terms of the CAISO Tariff, including the design and intention underlying Tariff provisions.

109.   As a result, when JPM Ventures submitted bids in the California wholesale electrical market to sell and buy electricity, the market participants, including CAISO, believed that the bids were being submitted based on competitive market principles and in accordance with the design and intention of the CAISO Tariff and automated system in promoting a competitive market in which sellers are fairly compensated and buyers receive a competitive price.

110.   JPM Ventures fraudulently concealed from CAISO and the other participants in the California wholesale electrical market that it was illegally manipulating the market to garner above-market-rate prices for its generation and sale of electricity and that its bids were based on exploiting the Tariff by engineering circumstances for which the Tariff and the CAISO automated system were not designed.

111.   The reliance of CAISO and buyers and sellers in the California wholesale electrical market was reasonable because JPM Ventures concealed from them that it was acting fraudulently, manipulatively, and illegally in participating in the market and placing bids to buy and sell wholesale electricity.

### E. California's retail electrical consumers have been damaged by JPM Ventures' illegal and fraudulent conduct

#### 1.  The costs of JPM Ventures' market manipulation were passed on to utilities

112.   In operating the wholesale market, CAISO pays sellers pursuant to its Tariff.

113.   CAISO, in turn, bills buyers for the electricity they purchase.

114.   CAISO uses "configuration guides" to calculate the amounts billed buyers, which are based on a number of inputs, including Day-ahead prices, Real-time prices, BCR payments, and exceptional dispatch payments. The configuration guides are designed to match the amounts CAISO pays to electricity producers for electricity and various services with the amounts CAISO charges to buyers for the electricity and services.

115.   Investor owned utilities purchase most of the electricity sold in the California wholesale market.

116.   CAISO billed investor owned utilities, including SCE and SDGE, for the great majority of the monies that JPM Ventures was paid as the result of its manipulative and deceptive bidding strategies.

117.   The utilities paid CAISO the monies billed.

118.   JPM Ventures' manipulative and deceptive bidding practices also increased the market price for electricity.

## 2. The utilities have passed on the cost of JPM Ventures' market manipulation to their retail customers

119.   Investor owned utilities are regulated by the California Public Utilities Commission.

120.   In the 1990's the state of California and the federal government passed legislation to "deregulate" the energy industry, including the electrical industry. The changes in the law were exploited by companies like Enron. One consequence was the upending of energy price stability on which regulated electrical utilities had depended. A prominent casualty was Pacific Gas and Electric Company (PGE), an investor owned utility, which filed for bankruptcy in 2001.

121.   California subsequently enacted laws to protect utilities from fluctuations in energy prices. California Public Utility Code §454.5 authorized the creation of "power procurement balancing accounts" for utilities to ensure timely recovery of procurement costs.

122.   The California Public Utility Commission subsequently authorized the establishment of "Energy Resource Recovery Accounts" (ERRA) for investor owned utilities, including SCE, SDGE, and PGE. ERRA's include procurement costs for electricity purchased in the CAISO wholesale markets.

123.   During the calendar years 2010 through 2012, investor owned utilities, including SCE, SDGE, and PGE, maintained ERRA accounts that included their CAISO wholesale electric market procurement costs.

124.   Pursuant to PUC 454.5 and CPUC decisions based on that statute, the rates investor owned utilities charged their retail electric customers during the years 2010 – 2012 were adjusted to reflect their ERRA balance.

125.   As a result, the higher costs of electricity caused by JPM Ventures' market manipulation were borne by the retail customers of investor owned utilities, including SCE, SDGE, and PGE.

## V.   CLASS ACTION ALLEGATIONS

126.   Plaintiffs bring this action individually and on behalf of the following proposed Class:

> All persons who paid SCE, SDGE, or PGE for electricity transmitted between September 8, 2010 and November 30, 2012.

Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

127.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

128.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

129.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

      a.   Whether JPM Ventures devised schemes or artifices to defraud;

      b.   Whether JPM Ventures, for the purpose of executing schemes or artifices to defraud, sent or received matters or things delivered through the Postal Service and/or a commercial interstate carrier;

c.  Whether JPM Ventures, for the purpose of executing schemes or artifices to defraud, transmitted or received signals and communications via the internet, telephone, wires, cables, wireless, and/or satellite transmissions, in interstate or foreign commerce;

d.  Whether JPM Ventures operated and managed an association-in-fact enterprise;

e.  Whether JPM Ventures engaged in racketeering activities in violation of 18 U.S.C. §§1961(1) *et seq.*;

f.  Whether JPM Ventures utilized or employed, either directly or indirectly, manipulative devices or contrivances in violation of 16 U.S.C. §824v(a) while bidding to supply electrical power in the California wholesale market between September 8, 2010, and November 30, 2012;

g.  Whether JPM Ventures knowingly, willfully, and falsely utilized or employed, either directly or indirectly, manipulative devices or contrivances in violation of 16 U.S.C. §§824v(a) and 825o while bidding to supply electrical power in the California wholesale market between September 8, 2010, and November 30, 2012;

h.  Whether JPM Ventures knowingly, willfully, and falsely reported information to CAISO about its bidding practices in violation of 16 U.S.C. §§824u, 825o, and 824v(a);

i.  Whether JPM Ventures submitted misleading profit and loss statements to CAISO in violation of 16 U.S.C. § 824v(a);

j.  Whether JPM Ventures knowingly and willfully submitted misleading profit and loss statements to CAISO in violation of 16 U.S.C. §§824u and 825o;

k. Whether JPM Ventures' manipulation of the California wholesale electric market resulted in wholesale buyers paying higher prices for electricity;

l. Whether JPM Ventures' bidding practices in the California wholesale electric market between September 8, 2010, and November 30, 2012, resulted in higher prices for electricity by retail customers of investor owned utilities, including SCE, SDGE, and PGE.

130. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

131. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all Class members were comparably injured through Defendants' uniform misconduct described above. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

132. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and they will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

133. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the

resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. The proposed Class thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

134.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

135.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VI.   CLAIMS ALLEGED

## FIRST CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. §1962(c) (RICO)
### [AS TO ALL DEFENDANTS]

136.   The plaintiffs re-allege and incorporate by reference every allegation contained in paragraphs 1 – 135.

137.   JPM Ventures devised illegal and fraudulent schemes, artifices, devices, and contrivances to manipulate the California wholesale electrical market to reap payments substantially in excess of market prices for electricity produced by inefficient and otherwise money losing electrical generators.

138.   In the execution of its illegal and fraudulent schemes, artifices, devices, and contrivances, JPM Ventures operated and managed an association-in-fact enterprise. The enterprise is comprised of CAISO and the entities, including JPM Ventures, who buy and sell electricity in the wholesale electricity market overseen by CAISO.

139.   For the purpose of executing its illegal and fraudulent schemes, artifices, devices, and contrivances, JPM Ventures made and received transmissions over interstate wires. During telephone conversations between personnel from the CAISO market monitoring unit and legal counsel and senior representatives from three departments of JPM Ventures, including the compliance department, in the period from March to May 2011, representatives of JPM Ventures falsely, fraudulently, knowingly, and willfully misrepresented the reasons and motivations for JPM Ventures' bidding practices, as alleged in paragraphs 62 – 65, *infra*.

140.   Furthermore, JPM Ventures used the Postal Service, interstate commercial carriers, and interstate wires, including the internet, to transmit misleading profit and loss statements to CAISO during that same time period, as is alleged in paragraph 66, *infra.*

141.   JPM Ventures also transmitted signals and communications via interstate

wires, including the telephone and internet, in executing its illegal and manipulative bidding strategies. The JPM Ventures division responsible for bidding the output of the California generators is located in Houston, Texas. JPM Ventures placed bids using interstate wire and internet transmissions with the CAISO automated system in California and received interstate wire and internet communications regarding bids and electrical generation from CAISO. JPM Ventures also received payments from CAISO via interstate wire transmissions. Furthermore, JPM Ventures communicated with CAISO by sending and receiving matters and things via the Postal Service and interstate commercial carriers.

142. JPM Ventures has engaged in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

143. JPM Ventures continuously devised and executed illegal and fraudulent schemes, artifices, devices, and contrivances, to manipulate the California wholesale market during a period from at least September 2010 through November 2012. That activity is described in detail in paragraphs 43 – 106, *infra*.

144. JPM Ventures' conduct also violated 16 U.S.C. §§824u, 825o, and 824v(a).

145. Therefore, JPM Ventures has engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1) *et seq.*

146. CAISO and the buyers and sellers in the California wholesale electrical market reasonably relied on JPM Ventures' fraudulent schemes, artifices, devices, and contrivances as set forth in paragraphs 67 and 107 – 111.

147. In overseeing the California wholesale electrical market, CAISO operates as an intermediary between buyers and sellers. CAISO pays monies to sellers for electricity pursuant to the rules set forth in the Tariff. CAISO bills buyers for the monies paid to the sellers.

148. Investor owned utilities, including SCE, SDGE, and PGE, are the principal buyers in the wholesale electric market.

149.   CAISO paid monies to JPM Ventures as a result of its racketeering activities. Those monies included BCR, noncompetitive ramp rate payments, noncompetitive Ancillary Service payments, and noncompetitive payments for electricity in general. CAISO, in turn, billed investor owned utilities, including SCE, SDGE, and PGE, for those monies, which the utilities paid to CAISO.

150.   All monies paid by investor owned utilities, including SCE, SDGE, and PGE, to CAISO for defendants' racketeering activities were passed on to the utilities' retail customers, who are the class members in this action.

151.   The plaintiffs were legally and proximately damaged by JPM Ventures' racketeering activities when they paid bills to investor owned utilities for electricity transmitted between September 8, 2010, and November 30, 2012. A portion of those bills was to pay for the monies defendants had received from CAISO because of JPM Ventures' illegal and fraudulent manipulation of the California wholesale electric market.

152.   Defendants' racketeering activities were also a proximate cause of higher market prices for wholesale electricity. The higher prices resulted in higher electricity costs for investor owned utilities, including SCE, SDGE, and PGE, and those costs were all passed on to the class members in this action.

153.   Plaintiffs' damages are 1) that portion of their electric bills that resulted from monies defendants' garnered from their racketeering activities, including employing and utilizing illegal, fraudulent, and manipulative schemes, artifices, devices and contrivances in the California wholesale electric market; and 2) that portion of their electric bills that resulted from higher wholesale electrical prices proximately caused by defendants' market manipulation. These amounts will be subject to proof at the time of trial.

154.   Pursuant to 18 U.S.C. §1964(c), plaintiffs are entitled to an award of treble damages and costs of suit, including reasonable attorney's fees.

# VII.   JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this complaint so triable.

## VIII.  PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves individually and on behalf of the Class, respectfully request judgment as to all Defendants as follows:

A.   For compensatory damages in an amount subject to proof at trial;

B.   For treble damages in an amount subject to proof at trial;

C.   For costs of suit, including reasonable attorney's fees; and

D.   For such other and further relief that the Court deems just and equitable.

Dated: March 9, 2015                    Respectfully submitted,


*/s/ Joseph J. Siprut*

Joseph Siprut* [IL Bar No. 6279813]
*jsiprut@siprut.com*
Todd McLawhorn* [IL Bar No. 6244265]
*tmclawhorn@siprut.com*
**SIPRUT** PC
17 North State Street
Suite 1600
Chicago, IL  60602
(312)236-0000
**www.siprut.com**

Mitchel J. Olson [CA Bar No. 082566]
Law Office of Mitchel J. Olson
1901 Camino Vida Roble, Suite 121
Carlsbad CA 92008
(858)688-7975

***Attorneys for Plaintiffs
and the Proposed Class***

* *Pro hac vice* application to be submitted

28